**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

TOBY CATON, )
)
        Petitioner, )
)
v. ) Case No. CIV-13-547-JHP
)
BRANDI NICOLE CATON, )
)
        Respondent. )

## **FINDINGS AND RECOMMENDATION**

This action was commenced by Petitioner Toby Caton ("Petitioner") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act. Petitioner alleges that Respondent Brandi Nicole Caton ("Respondent"), the mother of their minor son, P.M.C., wrongfully removed the child from the United Kingdom and wrongfully retains the child in the United States of America. Petitioner seeks the return of P.M.C. to the United Kingdom for adjudication on the issue of custody.

By Order entered January 7, 2014, United States District Judge James H. Payne, the presiding judge over this case, referred the Petition to the undersigned for the purpose of entering Findings and a Recommendation as to the final disposition of the Petition. To that end, on January 7 and continuing on January 8, 2014, this Court conducted a hearing on the merits of the Petition. Petitioner appeared personally and through counsel, Stephen Cullen, Kelly Powers, and Raymond Allred, while Respondent appeared

personally and through counsel, Anthony Allen and Geri Wisner. Based upon the evidence presented at trial and the arguments of counsel, this Court hereby enters the following findings of fact and conclusions of law in conformity with Fed. R. Civ. P. 52.

**FINDINGS OF FACT**

1. Petitioner is a citizen of the United Kingdom while Respondent is a citizen of the United States of America.

2. Petitioner and Respondent were married in La Jolla, California on January 3, 2010. At the time of the marriage, Petitioner had two minor children from a previous marriage, E.V.C. and T.L.C., sharing joint custody with his former spouse. Respondent had one minor child from a previous relationship, J.A.H.

3. Upon being married, Petitioner and Respondent agreed to live in Surrey, England, Petitioner's home residence. The couple traveled to England accompanied by J.A.H. as well as E.V.C. and T.L.C. with the intention that all were to live together under one roof. Respondent resided in England under a marriage visa, which allowed her to remain in the country indefinitely for the first two years and allowed her to work in the United Kingdom.

4. In the marriage, Petitioner was the bread winner, working in IT sales which required traveling locally and abroad upon occasion. Respondent remained in the home with the children.

5. On October 21, 2011, P.M.C., a son, was born to Petitioner and Respondent in Surrey, England. At the time, P.M.C. began receiving

a Child Benefit from the government in England, which is a payment intended to assist in the raising of the child. Respondent also received between $1,000.00 and $1,500.00 monthly in child support from Vance Holmes ("Holmes"), the father of J.A.H., who resided in the United States.

6. Problems developed in the marriage almost immediately which Respondent contends led to incidents of "domestic violence." Respondent testified that on the first night of their marriage, she decided to get out of bed and find some wine. Petitioner advised that no stores would be open but Respondent decided to go out in any event. A restaurant was near their home and Respondent went in for a beer. She was gone for about an hour when Petitioner appeared "in a rage", screamed at her, called her names, and pulled her around until her sweater tore. Petitioner drove away but returned to ask the bartender about Respondent's actions while she had been in the restaurant.

Arguments continued between the couple primarily concerning financial issues and Respondent's responsibilities with the children such taking the children to school which was some distance from their home. Respondent cited one "violent incident" involving Petitioner's breaking of an air purifier.

7. Another incident cited by Respondent occurred in December of 2010 when the father of J.A.H. came to England. Respondent and Holmes left together for dinner at Holmes' hotel to discuss issues

concerning J.A.H.. After dinner, Respondent was waiting on Holmes and sat down at a table with two gentlemen. Petitioner drove up to the hotel, screaming at Respondent. When Respondent returned home, she discovered Petitioner had broken dishes and jars on the floor. Although the children were present in the home, Respondent did not make any allegation that Petitioner had harmed, threatened, or committed any violence to them.

Respondent testified of a pattern occurring every three to four weeks whereupon Petitioner and Respondent would fight and then resolve their differences. Respondent stated, however, that at no time did Petitioner engage in physical violence with her while she was pregnant with P.M.C.

8. Respondent also testified she vacationed with Petitioner after P.M.C. was born to Cornwall, England. Respondent had returned from Texas where she had taken J.A.H. for visitation with Holmes and P.M.C. had accompanied her. While in Cornwall in May of 2013, Petitioner and Respondent discussed Respondent's desire to return to live in the United States. Petitioner allegedly "blew up" and told Respondent that she would never take P.M.C. to America. Respondent went for a walk and was gone for two hours. When she returned, Petitioner allegedly screamed at Respondent, telling her he had been looking for her and knocked a beer out of her hand. Petitioner loaded the car to return to their home but Respondent would not allow him to drive. The couple engaged in mutual

4

physical "pushing and pulling". Respondent pushed Petitioner and he pushed her back into a picnic table, which injured her back. Respondent testified she told Petitioner she wanted a divorce. The family returned to the marital home. Respondent was attended by a physician for her injury.

9. After this incident, Petitioner and Respondent became separated on May 27, 2013. Respondent then sought services in Surrey, England for assistance in domestic violence. Because Respondent was placed on a list for a place to live, she moved in with a friend. In the interim, it was determined by the Surrey governmental agency that Respondent's visa stated she could have no access to public funds and all of her requests for assistance were denied. Additionally, Petitioner states that he began paying child support to Respondent through a government child support agency at this time.

10. Respondent's and J.A.H.'s visas were also set to expire in September of 2013. They did not, however, possess the necessary funds to pay for the renewal of the visas. Respondent then determined that she could obtain temporary access to public funds due to her condition of financial destitution and allegations of domestic violence. Respondent received public assistance for three months. This assistance did not alter the expiration date of the visas.

11. Petitioner and Respondent attempted to go through marriage

counseling in July of 2013 while they were separated. Respondent stated they only attended one session. Respondent attended therapy and also obtained antidepressants and anti-anxiety medication.

12. Petitioner also stated that Respondent called the police at one time in July of 2013 alleging assault. No charges were ever prosecuted. Petitioner testified he was bloody from Respondent hitting him but lied and explained he was injured playing football.

13. Respondent testified Petitioner was never violent with P.M.C. She stated Petitioner was "verbally abusive" to J.A.H. but that there were no such episodes after P.M.C. was born as he served as a "pacifier."

14. Respondent stated she left the marital home on May 30, 2013 but wanted to return to obtain more of her belongings. Petitioner refused her request and changed the locks on the home. Respondent obtained access to the home surreptitiously. She discovered the floor of J.A.H.'s room was covered with broken Lego toys, a torn picture, and a destroyed video game.

15. Respondent stated Petitioner never "connected with" J.A.H., used a gruff, angry tone with him, used profanity toward him, and turned on him when Petitioner and Respondent fought. Petitioner, however, never exhibited such behavior or attitude toward P.M.C.

16. Respondent is currently pregnant with the couple's second child with a due date in late January or early February of 2014.

17. Respondent stated the couple had a conversation concerning

Respondent's return to the United States because she was unhappy in England. Respondent testified Petitioner "agreed to discuss it."

18. After Respondent left the marital home in May of 2013, Petitioner went to the Guilford County Court and obtained a prohibitive steps order against Respondent on June 4, 2013. Both Petitioner and Respondent appeared at a hearing on the request. Petitioner stated the judge informed Respondent that she could not take P.M.C. out of the country without permission and to do so would constitute child abduction. Respondent agreed not to remove P.M.C. from England. Petitioner testified that he never approved of Respondent taking P.M.C. out of England to live elsewhere. On one occasion, Respondent was required to take J.A.H. back to the United States for visitation with Holmes and returned to court to obtain permission. Respondent pleaded with Petitioner to allow P.M.C. to travel with her to the United States and promised not to take P.M.C. to live in the United States. Petitioner agreed and cancelled the prohibitive steps order. Respondent went to the United States for approximately six weeks but returned to England in August of 2013 and lived in a flat down the street from the marital home.

19. Upon Petitioner's return from a business trip in August of 2013, Respondent informed Petitioner that she was pregnant with their second child and the couple agreed to reconcile. Respondent returned to the marital home on September 27, 2013. Petitioner

7

testified that the couple did not discuss any further separation but did begin discussions concerning the children and their activities.

20. On October 9, 2013, Petitioner returned home from work to find Respondent's car keys pushed through the letter box and furniture missing from the marital home. Petitioner found a letter on the bed from Respondent which informed him that she had left with J.A.H., P.M.C., and, of course, their unborn child to go "home." Petitioner telephoned a friend to discover Respondent had taken a flight to Dallas, Texas. He also telephoned the police. He retained the services of solicitors within days of Respondent leaving to being the process of seeking the return of P.M.C.

21. Petitioner states that he only recently discovered that P.M.C. was at Respondent's parents' home in Durant, Oklahoma, although he had regularly utilized Skype to visit with P.M.C. since November of 2013.

22. On October 21, 2013, Petitioner filed an application under the Hague Convention. On December 20, 2013, Petitioner filed the subject Verified Petition for Return of Child to the United Kingdom and requested a show cause order. A show cause order was entered by District Judge Payne on December 27, 2013 which prohibited Respondent from removing P.M.C. from the jurisdiction of this Court. This Order remains in effect.

23. No divorce or custody proceedings have yet been initiated by

either Petitioner or Respondent in the United Kingdom or United States.

## **CONCLUSIONS OF LAW**

A.  Petitioner brings this action under the auspices of the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and as implemented in the United States by the International Child Abduction Remedies Act ("ICARA").  This Court possesses the requisite jurisdiction to determine whether P.M.C. was wrongfully removed from the United Kingdom and wrongfully retained in the United States.  In so doing, this Court must also determine which of these two countries represent P.M.C.'s "habitual residence" under the Hague Convention.  42 U.S.C. § 11603(b).

B.  The Hague Convention ". . . establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained . . . ."  42 U.S.C. § 11601(a)(4); Lops v. Lops, 140 F.3d 927, 935 (11th Cir. 1998).  The United States became a signatory to the Hague Convention in 1988.  42 U.S.C. § 11601(b).  The United Kingdom is also a signatory to the Hague Convention.  The primary purpose of the Hague Convention on Civil Aspects of International Child Abduction "is to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court."  Freidrich v. Freidrich, 983 F.2d 1396, 1400 (6th Cir. 1993).

C. The Hague Convention strives "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to insure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Art. 1(a) and (b). Article 3 of the Hague Convention defines the "wrongful retention" of a child under its terms as follows:

> a) it is in breach of rights of custody attributed to a person, . . . under the law of the State in which the child was habitually resident immediately before the . . . retention; and
>
> b) at the time of the . . . retention these rights were actually exercised, either jointly or alone, or would have been so exercised but for the . . . retention.

51 Fed. Reg. 10,493 at 10,506 (1986).

It is not this Court's function to delve into the merits of the underlying custody dispute. <u>Friedrich</u>, 983 F.2d at 1400. Rather, this Court's purpose in this Order is to determine whether P.M.C. has been "wrongfully retained" in a country different from his "habitual residence" and, if so, whether any of the Hague Convention's defenses apply to bar P.M.C.'s return to his habitual residence, as that term is defined by the Hague Convention as codified in the statutes of the United States.

D. In the United States, the ICARA establishes the procedures for the implementation of the Hague Convention by defining the burdens of proof for the various claims and defenses recognized under the

Hague Convention. 42 U.S.C. § 11601 *et seq*. Specifically, the ICARA requires the petitioner under the Hague Convention establish, by a preponderance of the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). The Hague Convention reflects a "strong presumption favoring the return of a wrongfully removed [or retained] child." Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002)(bracketed information added by this Court).

E. If a petitioner establishes by a preponderance of the evidence that a respondent's removal or retention of a child was wrongful within the meaning of the Hague Convention, the child's return is required unless the respondent can establish one of the Hague Convention's affirmative defenses by clear and convincing evidence. 42 U.S.C. § 11603(e)(2); Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995). These defenses include: (1) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (2) the proceeding was commenced more than one year after the removal of the child; (3) the child has become settled in his new environment; (4) there is a grave risk that the return of the child would expose him to physical or psychological harm. *See*, Hague Convention Art. 13. A court applying these exceptions is compelled to construe them narrowly. Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995). "In fact, a

federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001).

F. While the Hague Convention does not itself define what it means to be an "habitual resident," courts have concluded that the term refers to a child's customary residence prior to his removal. See Miller, 240 F.3d at 400 (citing Friedrich v. Friedrich, 983 F.2d 1396, 1401); Rydder, 49 F.3d at 373. Although this inquiry necessarily proceeds on a case-by-case basis, *see* Id. (citations omitted), it focuses not upon a child's domicile, or legal residence, but where the child physically lived for "an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Silverman v. Silverman, 312 F.3d 914, 916 (8th Cir. 2002)(citing Feder v. Evans-Feder, 63 F.3d 217, 224 (3rd Cir. 1995)).

G. Clearly, a parent cannot create a new habitual residence by wrongfully removing and sequestering a child. Miller, 240 F.2d at 400; Diorinou v. Mezitis, 237 F.3d 133, 142 (2nd Cir. 2001); Nunez-Escudero v. Trice-Menley, 58 F.3d 374, 379 (8th Cir. 1995); Freidrich, 983 F.2d at 1402. The preponderance of the evidence has unequivocally established that Respondent wrongfully removed P.M.C. from his habitual residence in the United Kingdom when she departed and took the child to the United States on October 9, 2013. She

continues to wrongfully retain P.M.C. in the United States in violation of the Hague Convention. Since Petitioner established a *prima facie* case for the return of P.M.C. under Art. 3 of the Hague Convention, this Court is obligated to determine whether Respondent has sustained her burden of establishing any of the affirmative defenses to the Hague Convention. 42 U.S.C. § 11601(a)(4).

H. Respondent has obliquely implicated the defense that Petitioner consented to or acquiesced in the removal of P.M.C. to the United States in agreeing to discuss the matter at one time. Nothing in the evidence indicates that Petitioner agreed to the removal of the child from the United Kingdom. Indeed, Petitioner took legal steps on at least two occasions to insure that Respondent did not take P.M.C. to live in the United States - first, in obtaining the prohibitive steps order and, second, in filing the Hague Convention application. An agreement to discuss Respondent living in the United States certainly does not represent and expression of consent or acquiescence.

I. The second and more developed argument concerns the defense that a grave risk exists that the return of P.M.C. to the United Kingdom will expose him to physical or psychological harm or abuse. A "grave risk" requires that "the 'potential harm to the child must be severe, and the level of risk and danger . . . very high.'" West v. Dobrev, 735 F.3d 921, 931 (10th Cir. 2013) quoting Souratgar v. Lee, 720 F.3d 96, 103 (2nd Cir. 2013). The Tenth Circuit in West

discussed that in three circuit courts, it has been determined that a "grave risk" of harm within the meaning of Art. 13(b) of the Hague Convention occurs in at least two instances. The return should not be ordered in cases where it would be to a zone of war, famine, or disease. Additionally, a child is in "grave risk" and should not be returned when the country of habitual residence may be incapable or unwilling to give the child adequate protection. Id. at 931, n.8. Nothing in the record indicates the United Kingdom meets either of these criteria to prevent the return of P.M.C. to its borders. The United Kingdom has many resources available to provide assistance to and protection for P.M.C.

In this case, Respondent has wholly failed to meet her burden of proving by clear and convincing evidence that P.M.C. would be subjected to a grave risk of physical or psychological harm if returned to the United Kingdom. By her own admission, P.M.C. has never been subjected to such harm by Petitioner and, in fact, he has acted as a pacifier to the tumultuous familial environment. Other than limited disciplinary action, none of the other children have been subjected to physical harm. While the poisoned atmosphere which existed in the home created less than desirable verbal assaults upon at least J.A.H., none of the conduct by Petitioner rises to the level of "grave risk" required under this restricted defense to the Hague Convention's mandate of the return of the child to his habitual residence. Moreover, the apparent

cause of the tense atmosphere existing in this family has now been removed – Petitioner and Respondent living under the same roof. All evidence indicates that the situation will be considerably calmer with this condition removed.

J. This Court specifically concludes Respondent has failed to prove by clear and convincing evidence that any of the defenses contained in Art. 13 of the Hague Convention as codified in the United States apply to this case.

K. This Court must address at least two of Respondent's counsel's arguments made in closing and intimated in the presentation of evidence. The contention that the return of the child would violate his human rights under the Hague Convention is roundly rejected. Neither the evidence nor the law supports such a contention. Additionally, Respondent frequently referred to P.M.C.'s status as a citizen of the Choctaw Nation, suggesting that this citizenship somehow precluded P.M.C.'s return to the United Kingdom. District Judge Payne has determined that the Indian Child Welfare Act did not apply because this proceeding does not implicate an issue of child custody. His tribal citizenship does not affect his status under the Hague Convention.

L. The parties and counsel have suggested many conditions proposed undertakings which might be better the circumstance of P.M.C. upon his return to the United Kingdom, including permitting Respondent to return with him when she is physically able mindful of her

pregnancy and be maintained in that country which issues of divorce and custody are adjudicated.  This Court charges both the parties and counsel to do all within their power to make this already difficult and chaotic situation progress with the least amount of disruption and stress to P.M.C.  While the marriage between Petitioner and Respondent might be considered at an unfortunate end, this Court has no doubt that both Petitioner and Respondent desire nothing but the best for P.M.C., regardless of their feelings for one another.  They should conduct themselves to achieve that end.

## CONCLUSION

Based upon the evidence presented in light of the governing law, this Court concludes P.M.C. was wrongfully removed from the United Kingdom by Respondent at time when that country represented his habitual residence.  As a result, it is the recommendation of this Court that Petitioner's Verified Petition for Return of Child to the United Kingdom be **GRANTED** and that the minor child should be returned to the United Kingdom forthwith pending the resolution of custodial issues with the appropriate court in that country.

The parties are herewith given fourteen (14) days from the date of the service of these Findings and Recommendation to file with the Clerk of the court any objections, with supporting brief. Failure to object to the Findings and Recommendation within fourteen (14) days will preclude appellate review of the judgment

of the District Court based on such findings.

IT IS SO ENTERED this 10th day of January, 2014.

Kimberly E. West
United States Magistrate Judge
Eastern District of Oklahoma